MAY 26, 1994

No. 93–8931 (A–901).   CAMPBELL v. WOOD, SUPERINTENDENT, WASHINGTON STATE PENITENTIARY, ET AL.   C. A. 9th Cir.   Application for stay of execution of sentence of death, presented to JUSTICE O'CONNOR, and by her referred to the Court, denied. Certiorari denied.   JUSTICE STEVENS and JUSTICE GINSBURG would grant the application for stay of execution of sentence of death.

JUSTICE BLACKMUN, dissenting.

In 1853, hanging was the "nearly universal form of execution" in the United States, *State* v. *Frampton*, 95 Wash. 2d 469, 492, 627 P. 2d 922, 934 (1981), and 48 States once imposed death by this method.   Today, only Washington and Montana still employ judicial hanging.,   Montana has not executed anyone by hanging in over 50 years, and no one who has contested the sentence has been lawfully hanged in the United States in more than three decades.[1]   Petitioner Charles Rodman Campbell, who is scheduled to be executed "by hanging by the neck" in Washington this week,[2] contends that his hanging will constitute a cruel and unusual punishment.   I agree, and accordingly, even if I believed that the death penalty could be applied constitutionally, see *Collins* v. *Collins*, 510 U. S. 1141, 1143 (1994) (BLACKMUN, J., dissenting), I would vote to grant the application for stay and the petition for certiorari in this case.[3]

---

[1] The only execution by hanging to occur since 1963 was that of Westley Alan Dodd, who was executed in Washington last year.   Dodd refused either to select his mode of punishment or to challenge his hanging sentence.

[2] Washington's death penalty statute, Wash. Rev. Code 10.95.180(1) (1992), provides: "The punishment of death . . . shall be inflicted either by hanging by the neck or, at the election of the defendant, by [lethal injection]."   For defendants like Campbell who are unwilling to select their mode of execution, Washington imposes death by hanging.

[3] Possible obstacles to review are the facts that petitioner's habeas claim might constitute a new rule under *Teague* v. *Lane,* 489 U. S. 288 (1989) (plurality opinion), and that no circuit conflict exists regarding whether hanging is cruel and unusual.   Because the only two States that retain hanging are in the Ninth Circuit, a circuit conflict on this issue is unlikely to emerge. Though I respect that Members of this Court may disagree, I would not await a conflict in a capital case raising a fundamental constitutional question such as this.

This Court has accepted that the Eighth Amendment's prohibition against cruel and unusual punishments "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion), and that the best evidence of these evolving standards "is the legislation enacted by the country's legislatures," *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989); see also *Stanford* v. *Kentucky*, 492 U. S. 361, 370 (1989) (citations omitted) ("'[F]irst' among the 'objective indicia that reflect the public attitude toward a given sanction' are statutes passed by society's elected representatives"); *Ford* v. *Wainwright*, 477 U. S. 399, 408–410 (1986). The public condemnation of hanging is overwhelming. Not only have 46 of the 48 States that once regularly imposed hanging abandoned the practice, but many state legislatures rejected the practice because it was perceived as inhumane and barbaric, precisely the concern that lies at the core of the Eighth Amendment. See, *e. g.*, *Furman* v. *Georgia*, 408 U. S. 238, 296–297 (1972) (Brennan, J., concurring) ("Since the development of the supposedly more humane methods" of lethal gas and electrocution, "hanging and shooting have virtually ceased"); *Malloy* v. *South Carolina*, 237 U. S. 180, 185 (1915) (noting that 11 States altered their practice based on "a well-grounded belief that electrocution is less painful and more humane than hanging"). But see *Glass* v. *Louisiana*, 471 U. S. 1080 (1985) (Brennan, J., dissenting) (arguing that death by electrocution is cruel and unusual). Even as the death penalty's popularity has increased in recent years, toleration for hanging has steadily declined. Of the eight States that provided for judicial hanging by the time of the *Furman* decision, see 408 U. S., at 297, n. 50 (Brennan, J., concurring), all but two have abolished it. Today, the only three jurisdictions in the English-speaking world that impose state-sponsored hangings are Washington, Montana, and South Africa.[4] App. to Pet. for Cert. A–38.

Moreover, the States' rejection of hanging has been much more universal than that of practices this Court previously has found to be cruel and unusual. Compare *Thompson* v. *Oklahoma*, 487

---

[4] Hanging in South Africa also soon may be a thing of the past. Former President F. W. de Klerk imposed a moratorium on hanging in South Africa in 1990, and no one has been executed in that country since 1989. The African National Congress has campaigned to abolish the death penalty. See N. Y. Times, Apr. 27, 1994, section A, p. 9, col. 1.

U. S. 815 (1988) (invalidating capital punishment for offenders under age 16 where almost two-thirds of state legislatures rejected the practice); *Enmund* v. *Florida*, 458 U. S. 782 (1982) (striking down the death penalty for vicarious felony murders where only eight States still authorized the punishment); *Coker* v. *Georgia*, 433 U. S. 584, 595–596 (1977) (abolishing the death penalty for rape where only Georgia imposed death for rape of an adult and only three States imposed the penalty for any rape), with *Stanford* v. *Kentucky*, 492 U. S., at 371 (upholding the death penalty for 16-year-olds since "a majority of the States that permit capital punishment authorize" the practice). If the Eighth Amendment represents anything other than a prohibition against punishments that have been entirely abolished, a punishment once universally practiced and then abandoned *specifically due to its inhumanity* must qualify as cruel and unusual.

In a 6-to-5 en banc opinion, the Court of Appeals for the Ninth Circuit disregarded this overwhelming evidence of state practice, holding that such evidence is relevant to consideration only of the *proportionality* of a death sentence. Where the *method* of execution is contested, the majority reasoned, the Eighth Amendment prohibits only "the unnecessary and wanton infliction of pain." App. to Pet. for Cert. A–20. Because hanging does not inflict "purposeful cruelty," the method is constitutional. *Id.*, at A–25. The Ninth Circuit's analysis is surprising given that this Court never has held that pain is the exclusive consideration under the Eighth Amendment, nor distinguished between challenges to the proportionality and the method of capital punishment. To the contrary, we have suggested that "[a] penalty must also accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment,'" *Gregg* v. *Georgia*, 428 U. S. 153, 173 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), a suggestion supported by our recognition that *painless*, post mortem punishments such as public display, drawing and quartering, and mutilation also violate the Eighth Amendment. *Wilkerson* v. *Utah*, 99 U. S. 130, 135–136 (1879).

But the en banc panel's emphasis on pain also fails on its own terms. Under the most "ideal" of circumstances, hanging kills by breaking the spine. "When the victim is dropped from a sufficient height his vertebrae are dislocated and his spinal cord crushed; unconsciousness is immediate and death follows a short time later." App. to Pet. for Cert. A–49 (Reinhardt, J., dissent-

ing), quoting Gardner, Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment, 39 Ohio St. L. J. 96, 120 (1978). Hanging, however, is a crude and imprecise practice, which always includes a risk that the inmate will slowly strangulate or asphyxiate, if the rope is too elastic or too short, or will be decapitated, if the rope is too taut or too long. A veteran prison warden has described a typical hanging:

"When the trap springs he dangles at the end of the rope. There are times when the neck has not been broken and the prisoner strangles to death. His eyes pop almost out of his head, his tongue swells and protrudes from his mouth, his neck may be broken, and the rope many times takes large portions of skin and flesh from the side of the face that the noose is on. He urinates, he defecates, and droppings fall to the floor while witnesses look on." App. to Pet. for Cert. A–57 (Reinhardt, J., dissenting), quoting Gardner, 39 Ohio St. L. J., at 121.

A person who slowly asphyxiates or strangulates while twisting at the end of a rope unquestionably experiences the most torturous and "wanton infliction of pain," *Gregg* v. *Georgia*, 428 U. S., at 173 (joint opinion of Stewart, Powell, and STEVENS, JJ.), while partial or complete decapitation of the person, as blood sprays uncontrollably, obviously violates human dignity.

Washington contends that by conducting its hangings pursuant to its Field Instruction WSP 410.500 or "protocol," these misfortunes can be reduced. Washington's protocol details the appropriate placement of the noose knot and the width and length of the rope to avoid decapitation, and provides that the rope be boiled, stretched, and waxed to reduce asphyxiation. The protocol includes a chart for determining, based on the weight of the defendant, the appropriate distance the body should be dropped. Washington relies entirely on this protocol in conducting its judicial hangings; the State employs no "trained hangers," nor, apparently, are there any persons so trained in the United States. App. to Pet. for Cert. A–26.

The Ninth Circuit relied on this protocol and the State's own evidence from its sole recent hanging to find only a "slight risk" that death by hanging will not be rapid or comparatively painless. *Id.*, at A–25. Washington's protocol, however, is derived almost

verbatim from a 1959 military execution manual that never has been used in any hanging, and that is almost indistinguishable from hanging procedures that resulted in torturous deaths and mutilations in the past. See *id.*, at A–50, and n. 31 (Reinhardt, J., dissenting). Experts for both parties who testified before the District Court agreed that hanging always includes a risk that unconsciousness and death will not be instantaneous, and admitted that a certain number of Washington's hangings inevitably will result in death by decapitation. The State presented no evidence that Washington's protocol will significantly reduce the risk of asphyxiation or decapitation, and Campbell introduced unrefuted testimony that the protocol actually may increase the likelihood that an inmate's head will be torn off. The evidence in the record is uncontested, therefore, that Washington's hangings will suffer the inevitable failings that led all but one other State to abandon hanging as a means of execution.

I do not dispute that petitioner's crime was horrible or that his punishment should be severe. It is equally irrefutable, however, that the Constitution prohibits the imposition of punishments that are offensive to civilized society. Forty-six of the forty-eight States that once imposed hanging have rejected that punishment as unnecessarily torturous, brutal, and inhumane. I can only conclude that today in the United States of America, hanging is cruel and unusual punishment. I dissent.